Philip M. Black (SBN 308619)
WOLF POPPER LLP
100 Pine St., Ste. 1250
San Francisco, CA 94111
Telephone: (415) 745-3232
Email: pblack@wolfpopper.com

Robert C. Finkel (*pro hac vice* application filed)
Timothy D. Brennan (*pro hac vice* application to be filed)
WOLF POPPER LLP
570 Lexington Ave.
New York, NY 10022
Telephone: (212) 759-4600
Email: rfinkel@wolfpopper.com
      tbrennan@wolfpopper.com

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| TIMOTHY COLLAR, JASON JORDAN, and CHRISTOPHER REYES, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> ROBINHOOD MARKETS, INC. and ROBINHOOD DERIVATIVES, LLC, <br><br> Defendants. | Civil Action No. <br><br> **COMPLAINT** <br><br> CLASS ACTION <br><br> DEMAND FOR JURY TRIAL |

Plaintiffs Timothy Collar, Jason Jordan, and Christopher Reyes (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendants Robinhood Markets, Inc., and Robinhood Derivatives, LLC (collectively "Robinhood" or "Defendants") to recover billions of dollars in wagers from Robinhood's unlawful operation of an unlicensed sports gambling platform and related deceptive and misleading business practices. Plaintiffs bring this action by and through their attorneys and allege, based upon personal knowledge as to their own actions and based upon information and belief and reasonable investigation by their counsel as to all other matters, as follows.

## **NATURE OF THE ACTION**

1. Plaintiffs bring this case as a related action to *Chehal, et al. v. Robinhood Markets, Inc., and Robinhood Derivatives, LLC*, Case No. 3:26-cv-03415-LJC (hereinafter, "*Chehal*"), to bring the Court's attention to the scale of Robinhood's unfair and deceptive conduct. *Chehal* was filed on April 22, 2026. Since then, more than two dozen users of Robinhood's Prediction Markets Hub from across the country have contacted Plaintiffs' counsel to describe their experiences of losing money wagering on Robinhood's illegal gambling enterprise.

2. Robinhood users have also taken to the social media to describe similar severe financial and personal hardship stemming from losses incurred through gambling on sports event contracts on Robinhood's Prediction Markets Hub, including losses totaling tens—and in some instances hundreds—of thousands of dollars. These users have reported patterns of conduct and resulting harms commonly associated with compulsive gambling activity, including repeated high-risk wagering behavior, escalating losses, financial distress, and significant emotional and familial strain. For example, on Reddit, one Robinhood user who identified himself as a "graduating senior in college (M22)" reported losing more than $20,000 over a four-month period. He further described feeling "incredibly lost" in the aftermath of those losses.[1]

3. To reiterate the allegations in *Chehal*, Defendant Robinhood facilitates the sale of illegal and unregulated sports event gaming contracts to its customers through its mobile app and

---

[1] https://www.reddit.com/r/problemgambling/comments/1s0pp4e/robinhood_predictions_ruined_my_life/

CLASS ACTION COMPLAINT

website.  The event contracts are listed by non-party KalshiEX, LLC, ("Kalshi") on its designated contract market.  Through a partnership with Kalshi, Robinhood facilitates the sale of Kalshi's sports event contracts to Robinhood's customers, who are led to believe that sports event contracts are a modern, sophisticated form of investing on a federally regulated commodities exchange that can be accessed on a phone.  In reality, the sports event contracts Robinhood sells are old-fashioned wagers on the outcomes of sporting events (i.e., gaming).  By operating an unlicensed sports gambling operation, Robinhood has violated state gambling laws and regulations, engaged in deceptive conduct, and unjustly enriched itself at the expense of millions of consumers.

4.      Robinhood began selling event contracts on October 28, 2024, to anyone over the age of 18 in all 50 states, even in states where gambling in casinos and making bets through sportsbooks is restricted to individuals who are 21 or older, like New Jersey.  Robinhood aggressively markets prediction markets—through push notifications from its app, email solicitations, ads on the internet, and television—to potential users and accepts payments through financial systems widely accessible to consumers.

5.      According to Robinhood, "[a]n event contract is a type of financial derivative that allows traders to speculate on a specific event. These contracts are generally structured around 'Yes' or 'No' positions and fluctuate in price based on the projected occurrence of the event. Event contracts then pay out if the position held matches the correct occurrence of the event; otherwise, they expire with no value."[2]  Event contracts are priced between one cent and 99 cents with each cent representing a 1% probability of the event occurring.  As described by Robinhood, "if a contract is priced at 53 cents, this can be interpreted as a 53% probability that it will occur according to that market."[3]

6.      Robinhood's first event contracts allowed users to trade on the outcome of the 2024 presidential election by offering a contract for Kamala Harris and a contract for Donald Trump. On March 17, 2025, Robinhood expanded its prediction market gaming offerings to illegal sports betting

---

[2]  Robinhood Markets, LLC, SEC Form 10-K/A, p. 13 (Dec. 31, 2025). Available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001783879/000178387926000029/hood-20251231.htm.
[3]  https://robinhood.com/us/en/support/articles/robinhood-event-contracts/ (last accessed April 2, 2026).

through its partnership with Kalshi while continuing to maintain the fiction that users were trading event contracts on its "Prediction Markets Hub."[4]

7. In offering sports gambling to consumers, Robinhood creates a misleading impression either actively or by omission that Kalshi's prediction markets have the approval of state gambling control authorities and are legal when, in fact, they do not and are illegal under state law.

8. Persons who are prone to gambling compulsions and avoid gambling websites, and who maintain brokerage accounts with Robinhood, are exposed to gambling-related communications and at times succumb to the abuses of compulsory gambling.[5]

9. Most perniciously, unlike traditional gambling sites that require cash deposits for gambling, Robinhood enables brokerage clients to gamble against margin on security positions, exposing customers to substantial losses on their stock portfolios.

10. Legislators in Florida and Georgia have begun debating bills proposed to address the rapid rise of prediction markets. Meanwhile, regulators in Michigan, New York, and New Jersey, among others, have already sent cease-and-desist letters to operators of online prediction markets. In addition, New York State Attorney General Letitia James issued a Consumer Alert on February 2, 2026, ahead of the 2026 Super Bowl, in which she noted, "[p]rediction markets may appear as modern, high-tech platforms for speculation or 'forecasting,' but in practice, many operate as unregulated

---

[4] Robinhood Markets, LLC, SEC Form 10-K/A, p. 13 (Dec. 31, 2025) (Robinhood's SEC Form 10-K states, "[o]ur customers can trade event contracts on a regulated exchange using out Prediction Markets Hub, for which we charge a commission for each contract traded."). Available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001783879/000178387926000029/hood-20251231.htm.

[5] A review of sports wagering and gambling addition studies conducted by the National Council on Problem Gambling shows that "[t]he rate of gambling problems among sports bettors is at least twice as high as among gamblers in general.... [and] the rate of problems is even higher" when sports wagering takes place online, "with one study of online sports gamblers indicating that 16% met clinical criteria for gambling disorder and another 13% showed some signs of gambling problems. *A Review of Sports Wagering & Gambling Addiction Studies Executive Summary*, NAT'L COUNCIL ON PROBLEM GAMBLING, https://www.ncpgambiing.org/wpcontent/uploads/2023/09/Spmisgambling_NCPGLitRvwExecSummary.pdf.

CLASS ACTION COMPLAINT

gambling without the basic protections New York consumers both deserve and expect from properly licensed operators."[6]

11.    Plaintiffs bring this class action on behalf of themselves and the classes of all others similarly situated persons (defined below) to seek relief from Robinhood's unlawful sports gambling operations.

**PARTIES**

12.    Plaintiff Jason Jordan is a resident and citizen of Georgia.  Plaintiff Jordan wagered and lost money trading sports event contracts through Robinhood's Prediction Markets Hub.

13.    Plaintiff Timothy Collar is a resident and citizen of Florida.  Plaintiff Col wagered and lost money trading sports event contracts through Robinhood's Prediction Markets Hub.

14.    Plaintiff Christopher Reyes is a resident and citizen of New York. Plaintiff Reyes wagered and lost money trading sports event contracts through Robinhood's Prediction Markets Hub.

15.    Defendant Robinhood Markets, Inc., is a Delaware corporation with its principal place of business located in Menlo Park, California.  Defendant Robinhood Markets, Inc. conducts business in California and throughout the United States. Robinhood Markets, Inc., is the parent company of Robinhood Derivatives, LLC.

16.    Defendant Robinhood Derivatives, LLC, is a Delaware limited liability company with its principal place of business in Menlo Park, California. Robinhood Derivatives, LLC, is a wholly owned subsidiary of Robinhood Markets, Inc. and conducts business in California and throughout the United States.  According to Robinhood Markets, Inc.'s SEC Form 10-K, Robinhood Derivatives "facilitate[s] trading of futures contracts, event contracts, and options on futures contracts for our customers."[7] In its SEC Form 10-K, Robinhood Markets, Inc. refers to itself and its subsidiaries, including Robinhood Derivatives, LLC as "we," "us," "Robinhood," or the "Company," and states that "[o]ur corporate headquarters are located in Menlo Park, California."[8]  Each of Robinhood

---

[6] https://ag.ny.gov/press-release/2026/consumer-alert-and-industry-alert-attorney-general-james-warns-new-yorkers.

[7]    Robinhood,    SEC    Form    10-K/A,    p.    30    (Dec.    31,    2026).    Available    at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001783879/000178387926000029/hood-20251231.htm.

[8] *Id.* at 4, 97.

CLASS ACTION COMPLAINT

Derivatives, LLC's Head of Engineering, Assistant General Counsel (Regulatory), and Deputy General Counsel conduct business within this District.

17. Robinhood Markets, Inc., is generally responsible for all of Robinhood's operations, including prediction markets, whereas Robinhood Derivatives, LLC, is specifically responsible for facilitating the sale of gaming event contracts. Because of their similarity in function, Robinhood Markets and Robinhood Derivatives are referred to globally herein as "Robinhood."

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1332, because the proposed class consists of 100 or more potential class members; the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and minimal diversity exists.

19. This Court has personal jurisdiction over Defendants because Robinhood's principal place of business is within this District and Robinhood conducts substantial business in this District.

20. Venue properly lies in this District pursuant to 28 U.S.C. § 1391 because Defendants reside within this District within the meaning of 28 U.S.C. § 1391 and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## DIVISIONAL ASSIGNMENT

21. Pursuant to Northern District of California Civil Local Rules 3-2(c), 3-2(d), and 3-5(b), assignment to the San Francisco or Oakland Division of this District is proper because Robinhood's principal office is located in San Mateo County, California, and a substantial part of the events giving rise to the claim occurred in San Mateo County.

## FACTUAL ALLEGATIONS

**I.** **Robinhood Markets Offers Sports Betting, which Robinhood Refers to as Sports Event Contracts**

22. Robinhood Markets was founded in 2013 with the mission to "democratize finance for all." Robinhood Markets was the first U.S. retail broker to offer commission-free stock trading with no account minimums, which was subsequently adopted by the industry. Robinhood Markets began by offering equity trading on its mobile-first platform.

– 6 –

23.     On October 28, 2024, Robinhood introduced its first prediction market, the "Presidential Election Market."[9]  Robinhood stated, "customers will be able to trade based on their prediction for 'who will win the 2024 presidential election.' There will be two contracts to choose from–one for Kamala Harris and one for Donald Trump."

24.     Robinhood describes event contracts as "allow[ing] customers to trade on the outcome of specific events," and further stated, "[w]e believe event contracts give people a tool to engage in real-time decision-making, unlocking a new asset class that democratizes access to events as they unfold."[10]

25.     On February 3, 2025, Robinhood announced the launch of event contracts for Super Bowl LIX, which was Robinhood's first attempt to offer sports-related event contracts.[11]  The event contracts were made available "in all 50 states through KalshiEX, LLC, a regulated exchange," and "allow[ed] eligible customers to place trades on the outcome of the … showdown between Kansas City and Philadelphia."  The announcement stated that "[e]vent contracts for the Pro Football Championship leverage the power and rigor of financial market structure to facilitate greater liquidity, transparency, and price discovery[.]"  The announcement further stated, "Robinhood's mission is to democratize finance for all.  With an emerging asset class like event contracts, we recognize an opportunity to better serve our customers as their interests converge across the markets, news, sports, and entertainment."  A Robinhood spokesperson stated that partnering "with Kalshi was the best way for us to offer the Pro Football Championship contract in time for the game."

---

[9] https://robinhood.com/us/en/newsroom/introducing-the-presidential-election-market/ (dated October 28, 2024; last accessed April 13, 2026).

[10] *Id.*

[11] Robinhood has removed this post from its website. However, the announcement was reported by various news sources.  *See* https://www.investopedia.com/robinhood-launches-pro-football-championship-contracts-super-bowl-kansas-city-chiefs-philadelphia-eagles-8785040 (dated February 3, 2025; last accessed April 2, 2025); https://frontofficesports.com/robinhood-to-offer-super-bowl-betting/ (dated February 3, 2025; last accessed April 2, 2025); https://fortune.com/2025/02/03/robinhood-super-bowl-bets/ (dated February 3, 2024; last accessed April 2, 2025);  https://closingline.substack.com/p/the-early-line-florida-tells-offshore-sportsbooks-to-leave (dated February 2, 2025; last accessed April 2, 2025).

– 7 –

CLASS ACTION COMPLAINT

26.     The next day, on February 4, 2025, Robinhood announced that it had suspended the event contracts for Super Bowl LIX following the CFTC's request that Robinhood "'not permit customers to access' sports event contracts.'"[12]  In response, Robinhood posted on X:

> We are disappointed by this outcome, especially given that we had been in regular communication with the CFTC about our intent and plans to offer this product. We will continue to collaborate with the CFTC as we work to roll out a more comprehensive event contracts platform later this year.

27.     On March 17, 2025, Robinhood launched its Prediction Markets Hub and began offering sports event contracts, which became available across the U.S. through KalshiEX, LLC.[13] Robinhood stated that "the hub will allow customers to trade contracts for what the upper bound of the target fed funds rate will be in May, as well as the upcoming men's and women's College Basketball Tournaments."  In connection with this launch, JB Mackenzie, the Vice President and General Manager of Futures and Prediction Markets at Robinhood Markets, stated, "[w]e believe in the power of prediction markets and think they play an important role in the intersection of news, economics, politics, sports, and culture.  We're excited to offer our customers a new way to participate in prediction markets and look forward to doing so in compliance with existing regulations."  That same day, event contracts related to the NCAA college basketball tournaments became available.

28.     On August 19, 2025, Robinhood added professional and college football event contracts to its Prediction Markets Hub.[14]  Mackenzie stated, "[a]dding pro and college football to our prediction markets hub is a no-brainer for us as we aim to make Robinhood a one-stop shop for all your investing and trading needs."  Robinhood stated, "[u]nlike sports betting, where the firm sets a line, event contracts leverage the power and rigor of financial market structure and are offered in a marketplace where buyer and sellers interact to set the price."

---

[12]   https://robinhood.com/us/en/newsroom/robinhood-receives-formal-request-from-the-cftc-to-roll-back-the-pro-football-championship-market/ (dated February 4, 2025; last accessed April 13, 2026).
[13] https://robinhood.com/us/en/newsroom/robinhood-prediction-markets-hub/ (dated March 17, 2025; last accessed April 13, 2026).
[14] https://robinhood.com/us/en/newsroom/pro-and-college-football-prediction-markets/ (dated August 19, 2025; last accessed April 13, 2026).

CLASS ACTION COMPLAINT

29.    On December 16, 2025, Robinhood announced the launch of new types of sports event contracts, including "preset combos," "custom combos," and "player contracts," which mirror traditional forms of sports wagering such as point spreads, totals, player props, and parlays:

> **Preset Combos**: Customers will be able to trade preset combos for individual Pro Football games, giving them another way to turn their nuanced sports knowledge into an investing opportunity. These will be a combination of the outcomes, totals, and spreads within a single game. Like any event contract, these combos will pay $1 dollar, but only if each of the outcomes in the contract resolves correctly.

> **Custom Combos**: Early next year, we'll add support for custom combos, which will allow customers to combine up to ten outcomes into one new contract across Pro Football games.

> **Player Contracts**: Starting today, customers can track and trade individual Pro Football player performances like Anytime TD, Passing Yards, Receiving Yards, Rushing Yards, and more in real time, all in one place. Player contracts for more sports will be rolling out soon as well.[15]

30.    The announcement stated, "[t]hese tools give traders greater precision, control, and access to the events they care about most. Expanding our prediction markets is an important step forward in our goal to enable anyone to trade, invest or hold any financial asset and conduct any financial transaction through Robinhood."  The announcement also reported that Robinhood's Prediction Markets Hub was "Robinhood's fastest-growing product line by revenue ever, with 11 billion contracts traded by more than 1 million customers" since its launch.

31.    On November 19, 2025, Robinhood invested in Rothera, a joint venture with Susquehanna International Group, to advance the development of an independent, CFTC-licensed exchange and clearinghouse for its prediction markets.  In connection, on January 20, 2026, Rothera acquired a 90% majority stake in MIAXdx, renamed Rothera E&C, a CFTC-licensed designated contract market, derivatives clearing organization, and swap execution facility.  Robinhood Markets' investments in Rothera and MIAXdx was intended to allow Robinhood Markets to operate prediction markets independently of Kalshi.

---

[15]  https://robinhood.com/us/en/newsroom/robinhood-presents-yes-no-event/ (dated December 16, 2025; last accessed April 2, 2026).

– 9 –

32.     Currently, Robinhood's Prediction Markets Hub offers event contracts across fifteen (15) different sports, including in racing, Esports, and cricket.[16]  Recently, on February 8, 2026, an estimated $285 million was traded on Robinhood's platform on the winning team of Super Bowl LX alone.[17]

33.     Robinhood describes this expanded offering of event contracts as "unlocking a new asset class."  However, unlike with its other offerings, Robinhood charges a commission of $0.01 for each event contract bought or sold on its Prediction Markets Hub.  Robinhood may also charge an exchange fee depending on the exchange the contract is traded on, which is typically $0.01 per contract.  Because Robinhood's contracts are historically sourced from Kalshi, its Prediction Markets Hub is substantially identical to the prediction market platform Kalshi offers on its own website.

34.     California law governs the Customer Agreement between Robinhood and its users and all transactions made in customer accounts.

35.     Under the terms of its agreement with Kalshi, Robinhood shares in Kalshi's "transaction fee" and earns interest on consumer funds each time an event contract is purchased on its platform. It is therefore a "winner" for all the same reasons and in the same way that Kalshi is a "winner." And it acts in concert and in privity with Kalshi to secure Kalshi's winnings at the expense of individual gamblers.

36.     According to Robinhood, more than 12 billion event contracts were traded on Robinhood in 2025, including a record 8.5 billion traded in the fourth quarter alone.[18]

37.     Customers who maintain Robinhood brokerage accounts and who recognize their own susceptibility to compulsive gambling were exposed to Robinhood's ubiquitous promotional material concerning prediction markets (i.e., gambling).

38.     Robinhood enables customers to place gaming wagers against margin on their securities portfolios, exposing customers to the loss of their securities portfolios through unregulated and potentially compulsive gaming activities.

[16] Robinhood, https://robinhood.com/us/en/prediction-markets/.
[17] MarketWatch, https://www.marketwatch.com/story/in-a-coming-out-party-for-prediction-markets-and-sports-people-just-traded-nearly-1-5-billion-on-the-super-bowl-winner-86613100.
[18] https://www.wsj.com/finance/stocks/robinhood-earnings-q4-2025-hood-stock-fd4f6c37.

– 10 –

CLASS ACTION COMPLAINT

39.    In its fiscal year ending December 31, 2025, Robinhood collected $302 million in "other transaction-based revenue," a 260% increase from the previous year, which was "primarily driven by increased user activities in Prediction Markets and instant withdrawals."[19]

**II.    Plaintiffs Lost Money On Robinhood's Sports Event Contracts**

40.    Plaintiff Jordan lost $4,013.40 wagering on Robinhood's Prediction Markets Hub in April 2026 (including on sports event contracts) and incurred an additional $970.92 in fees and commissions.

41.    Plaintiff Collar lost $142,158.60 wagering on Robinhood's Prediction Markets Hub in December 2025 (including on sports event contracts) and incurred an additional $17,572.14 in fees and commissions.

42.    Plaintiff Reyes lost at least $1,000 wagering on Robinhood's Prediction Markets Hub since May 1, 2026 (including on sports event contracts) and incurred an additional $100 in fees and commissions.

**III.    Robinhood's Prediction Markets Hub Is an Illegal Gambling Operation**

43.    In 1992, the federal government passed the Professional Amateur Sports Protection Act ("PASPA"), which effectively outlawed sports betting nationwide, with the exception of a few states.

44.    In 2018, the Supreme Court struck down PASPA in *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453 (2018), holding that it violates the Constitution's "anticommandeering" principle by preventing the states from modifying or repealing its laws prohibiting sports gambling. In *Murphy*, the Supreme Court made clear that states, not the federal government, have the right to regulate sports betting.

45.    According to CBS Sports, since *Murphy* was decided, thirty-nine (39) states and Washington D.C. have legalized some form of sports betting as of April 6, 2026. Thirty (30) of those states have legalized online sports betting through smartphone apps or websites.[20]

---

[19] Robinhood Markets, Inc. Annual Report on Form 10-K/A at 110 (Feb. 20, 2026), available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001783879/000178387926000029/hood-20251231.htm.

[20] https://www.cbssports.com/betting/news/u-s-sports-betting-where-all-50-states-stand-on-legalizing-online-sports-betting-sites-proposed-legislation/.

CLASS ACTION COMPLAINT

46.    Despite Robinhood's performative sleight of hand in repackaging sports wagers as event contracts, these offerings are nothing more than unlawful online sports bets.  Robinhood's users place bets on the outcome of events they do not control and have no relationship to economic markets or events. A prediction market that offers sports event contracts is no different than a sports gambling book that lacks a license from any state gambling authority.

47.    Indeed, Robinhood offers sports event contracts that are functionally identical to sports bets found in traditional sportsbooks like DraftKings and FanDuel.[21]  As stated above, Robinhood offers sports event contracts that mirror Moneyline bets, point spreads, totals, player props, and parlays.  Moreover, Robinhood offers odds and payouts that are nearly identical to the odds and payouts offered by traditional sportsbooks.

---

[21] *See KalshiEX, LLC v. Flaherty*, 2026 U.S. App. LEXIS 9948, *20 (3d Cir. Apr. 6, 2026) (Roth, J., dissenting) (Kalshi's offerings "are virtually indistinguishable from the betting products available on online sportsbooks, such as DraftKings and FanDuel.").

– 12 –

48.    Robinhood's email solicitations are designed to evoke a sports gambling experience and deceptively represent that users can trade event contracts tied to professional sporting events. For example, on February 5, 2026—three days before the 2026 Super Bowl—Plaintiff Collar received the following email from Robinhood:



49.    The text of the email stated:

Get ready for the big game, Tim! You can trade event contracts for either a New England or Seattle win in the Prediction Market Hub. Watch as the market reacts to events in real time. Plus, combos are here. You can now trade pre-set multi-leg contracts or create your own. Combine outcomes like winner, totals, and player-level stats into one custom contract."

– 13 –

CLASS ACTION COMPLAINT

50. Kalshi, Robinhood's prediction markets partner, has gone further in its own advertising, proclaiming, "SPORTS BETTING IN CALIFORNIA IS NOW LEGAL:"



51. Kalshi acknowledged before the D.C. Circuit Court of Appeals that "Congress did not want sports betting to be conducted on derivatives markets." Brief for Appellee KalshiEX LCC at 41, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024).

52. Similarly, Robinhood's Prediction Market Hub is an illegal gambling operation.

53. In New York, "sports wagering" is defined as:

wagering on sporting events or any portion thereof, or on the individual performance statistics of athletes participating in a sporting event, or combination of sporting events, by any system or method of wagering, including, but not limited to, in-person communication and electronic communication through internet websites accessed via a mobile device or computer, and mobile device applications; provided however that sports wagers shall include, but are not limited to, single-game bets, teaser bets, parlays, over-under bets, money line, pools, in-game wagering, in-play bets, proposition bets, and straight bets[.]

– 14 –

N.Y. Pari-Mutual Law §§ 1367(1)(x).

54.    Neither Robinhood nor Kalshi is licensed by the New York State Gaming Commission (the "NY Commission") to engage in sports wagering in New York.  Indeed, on October 25, 2025, the NY Commission sent Kalshi, Robinhood's partner, a cease-and-desist letter for offering illegal sports bets under the guise of prediction markets.  On October 27, 2025, Kalshi sued the NY Commission in federal court injunctive and declaratory relief. Kalshi's request for an injunction is fully briefed and awaiting a decision from the court.

55.    Gambling is broadly prohibited in Georgia. <u>Under Georgia law:</u>
<u>"a person commits the offense of commercial gambling when he intentionally does any of the following acts: (1) Operates or participates in the earnings of a gambling place; (2) Receives, records, or forwards a bet or offer to bet; (3) For gain, becomes a custodian of anything of value bet or offered to be bet; . . . (5) Sells chances upon the partial or final result of or upon the margin of victory in any game or content or upon the performance of any participant in any game or contest…" Ga. Code Ann., § 16-12-22</u>

56.    A "bet" is defined in Georgia as "an agreement that, dependent upon chance even though accompanied by some skill, one stands to win or lose something of value." Ga. Code Ann., § 16-12-20(1).

57.    Neither Robinhood nor Kalshi is licensed by the State of Georgia to engage in sports wagering.

58.    Florida Statutes Annotated § 849.14 makes it a third-degree felony for anyone to stake, bet, or wager money or other things of value 'upon the result of any trial or contest of skill, speed or power or endurance of human or beast. Similarly, Fla. Stat. Ann. § 849.25 defines and prohibits "bookmaking," which includes "taking or receiving, while engaged in the business or profession of gambling, any bet or wager upon the result of any trial or contest of skill, speed, power, or endurance of human, best, fowl, motor vehicle, or mechanical apparatus." Section 849.25 lists seven factors "that shall be considered in making a determination that a person has engaged in the offense of bookmaking," including, "[t]aking or receiving more than wagers in any single day," (Fla. Stat. Ann. § 849,25(b)(3)); "[t]aking or receiving wagers totaling more than $500 in any single day, or more than $1,500 in any single week" (Fla. Stat. Ann. § 849.25(b)(5)); and "[t]aking or receiving wagers on both sides on a contest at the identical point spread." Fla. Stat. Ann. § 849.25(b)(6). According to the statute,

– 15 –

"[t]he existence of any two factors listed in paragraph (b) may constitute prima facie evidence of a commercial bookmaking operation."

59.    The Florida Gaming Control Commission (the "Florida Commission") is the state agency that regulates gambling in Florida. Fla. Stat. Ann. § 16.71. The Florida Commission exercises all regulatory and executive powers of the state with respect to gambling, including pari-mutuel wagering, cardrooms, slot machine facilities, and oversight of gaming compacts executed by the state. Fla. Stat. Ann.§ 16.712. Neither Robinhood nor Kalshi is licensed by the Florida Commission to engage in sports wagering in Florida.

60.    Gambling contracts are void as contrary to public policy in Florida. Fla. Stat. Ann. § 849.26 provides:

> All promises, agreements, notes, bills, bonds or other contracts, mortgages or other securities, when the whole or part of the consideration if for money or other valuable thing won or lost, laid, staked, betted or wagered in any gambling transaction whatsoever, regardless of its name or nature, whether heretofore prohibited or not, or for the repayment of money lent or advanced at the time of a gambling transaction for the purpose of being laid, betted, staked or wagered, are void and of no effect; provided, that this act shall not apply to wagering on pari-mutuels or any gambling transaction expressly authorized by law.

61.    Despite offering sports betting in various states, neither Robinhood nor Kalshi has registered for or obtained a license with any state gaming commission.  In doing so, Robinhood makes unlawful sports gambling widely available through its platform, without any safeguards mandated for licensed sports wagering operations and without oversight by any state gaming commission, exposing users to the harms of unregulated gambling.

62.    Several states, including New York and Georgia, allow individuals to recover funds lost in connection with an illegal gambling operation from any "winner," "stakeholder," or "person" who received their wagers under state laws modeled after the Statute of Anne – a British law passed in 1710 during the reign of Queen Anne that made certain gambling debts unenforceable.

63.    Robinhood's sports wagering operations also violate federal law.  The Dodd-Frank Act granted the CFTC discretionary power to review and prohibit six categories of derivative contracts if it concludes the contracts are "contrary to the public interest."  7 U.S.C. §§ 7a-2(c)(5)(C), (C)(i). Those categories include contracts involving "gaming" or "other similar activity determined by the

CLASS ACTION COMPLAINT

[CFTC], by rule or regulation, to be contrary to the public interest."  7 U.S.C. §§ 7a-2(c)(5)(C)(i)(V)-(VI).

64.    In 2011, the CFTC promulgated 17 C.F.R. § 40.11, which states, in relevant part, "[a] registered entity shall not list for trading or accept for clearing on or through the registered entity . . . [a]n agreement, contract transaction, or swap based upon an excluded commodity . . . that involves, relates to, or references gaming, or an activity that is unlawful under any State or Federal law[.]"  17 C.F.R. § 40.11(a)(1).  This Rule's prohibition of gaming contracts remains in place, rendering Robinhood's sports wagering offerings illegal under federal law.

65.    Gary Gensler, the former chair of the Commodity Futures Trading Commission who helped draft a regulation promulgated under Dodd-Frank that brought swaps under federal oversight, was quoted in *Barron's* as stating that the definition of "swap" was never meant to encompass sports event contracts.  Gensler stated further, "[n]obody was intending to pre-empt the New Jersey state gaming commission . . . It was politically not discussed, and if it had been, it would have been dead in Congress.  Senators wouldn't have voted for it." [22]

66.    Mr. Gensler filed an amicus curiae brief in *KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir.) (Dkt. 55), addressing whether Congress, through Dodd-Frank, intended to transform the Commodity Futures Trading Commission ("CFTC") into a nationwide sports-betting regulator and to displace states' traditional police powers over gaming. Mr. Gensler explains that the theory advanced by the operators of prediction markets like Defendants—that "by encompassing some event contracts within the statutory definition of swap, Congress purposefully made the CFTC a nationwide sports betting regulator and denied states their traditional police power to regulate gaming"—is wrong; "[t]he answer—from someone who was there—is that Congress did nothing of the sort." *Id*. at 3. Dodd-Frank, Mr. Gensler writes, "was aimed at the causes of the [2008] Financial Crisis, not sports betting." *Id*. at 13.

---

[22] Nick Devor, *Gary Gensler Paved the Way for Prediction Markets. Sports Betting Wasn't Part of the Plan*, BARRON'S, Apr. 15, 2026. Available at https://www.barrons.com/articles/sports-betting-prediction-markets-kalshi-polymarket-gensler-732c84cb.

– 17 –

CLASS ACTION COMPLAINT

67.    Mr. Gensler states further, "Kalshi treats the swap definition as if it includes sports betting, or at least sports bets listed on a DCM. That reading, though, is inconsistent with the purpose of the CEA, the statutory context of the swap definition, and the regulatory understanding of the relationship between sports bets, events contracts, and swaps." *Id*. at 16.

## CLASS ALLEGATIONS

68.    This action is brought by Plaintiffs, for themselves and on behalf of all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).  Plaintiffs seek to represent a nationwide class and subclass under California law of all persons who lost money trading one or more sports event contracts on Robinhood (the "Class"). Further,

a.    Plaintiff Collar seeks to represent a subclass of all persons in Florida who lost money trading one or more sports event contracts on Robinhood (the "Florida Subclass");

b.    Plaintiff Jordan seeks to represent a subclass of all persons in Georgia who lost money trading one or more sports event contracts on Robinhood (the "Georgia Subclass"); and

c.    Plaintiff Reyes seeks to represent a subclass of all persons in New York who lost money trading one or more sports event contracts on Robinhood (the "New York Subclass").

69.    Unless specifically indicated otherwise, all allegations below concerning the Class include and apply equally to the Subclasses, individually and collectively.

70.    Excluded from the Class are Robinhood, Robinhood's executives and officers, and any person, firm, trust, corporation, or other entity related to or affiliated with Robinhood's partners, subsidiaries, affiliates, or joint ventures.  Plaintiffs reserve the right to modify, change or expand the Class definition after conducting discovery.

71.    The members of the Class are so numerous and dispersed that it would be impracticable to join them individually.  At all relevant times, there were thousands or more of persons who lost money trading one or more sports event contracts on Robinhood.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but can be determined through discovery.

72.     Common questions of law or fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law or fact common to Class and/or Subclasses are:

a.  Whether, and to what extent, Robinhood's Prediction Markets Hub constitutes an illegal gambling operation;

b.  Whether Robinhood violated the laws referenced in the causes of action herein;

c.  Whether Robinhood's conduct was unfair, deceptive, and/or misleading in violation of state consumer protection statutes alleged herein;

d.  Whether Robinhood's wrongful conduct caused loss or damages to Plaintiffs and the Class, and if so,

e.  The amount of such loss or damages;

f.  Whether Robinhood's conduct caused Robinhood to be unjustly enriched; and

g.  Whether Plaintiffs and the Class are entitled to a reasonable award of attorneys' fees, interest, and costs of suit.

73.     Plaintiffs' claims are typical of the claims of the members of the Class they seek to represent because they all wagered and lost money on Robinhood's platform, which operates the same as to Class members.

74.     Plaintiffs will adequately represent and protect the interests of the Class and have no interests that conflict with or are antagonistic to the interests of Class members. Plaintiffs have retained attorneys who are experienced and capable of prosecuting class actions and complex litigation. Plaintiffs' attorneys will actively conduct and be responsible for prosecuting this litigation, and have adequate resources, experience, and commitment to litigate this matter.

75.     A class action is superior to any other method available for the fair and efficient adjudication of this controversy because it would be impractical and unduly burdensome for each of the individual Class members to bring a separate action.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the respective Class members to seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would

– 19 –

preclude its maintenance as a class action.  Moreover, individual litigation has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

76.    Defendants have acted on grounds that apply generally to the Class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

77.    Class certification is also appropriate because there is a readily identifiable class on whose behalf this action can be prosecuted. Class members are readily ascertainable from Robinhood's records.  A notice of pendency or resolution of this class action can be provided to Class members by direct mail, email, publication notice, or other similar means.

78.    To the extent reliance is an element of any of the claims asserted herein, Plaintiffs and all Class members uniformly have relied on Robinhood's conduct.

## CAUSES OF ACTION

## COUNT I

**Violations of New York General Business Law, N.Y. Gen. Bus. Law §§ 349, 350**

**On Behalf of Plaintiff Reyes and the New York Subclass**

79.    Plaintiff Reyes re-alleges and incorporates all other factual allegations set forth herein.

80.    The New York Pari-Mutual Wagering and Breeding Law ("NY PML") provides, "[n]o entity shall directly or indirectly operate an unlicensed sports wagering platform in the State of New York, or advertise or promote such unlicensed platform to persons located in the state of New York." N.Y. P.M.L. § 1367-a(4)(b).  In connection with mobile sports betting, the NY PML provides, "[n]o entity shall administer, manage, or otherwise make available a mobile sports wagering platform to persons located in New York state unless licensed with the commission." N.Y. P.M.L. § 1367-a(2)(a). Aside from wagering offered through licensed entities, New York declares unlawful "[a]ll wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever[.]" N.Y. Gen. Oblig. Law § 5-401.

81.    N.Y. Gen. Bus. Law § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service[.]"

CLASS ACTION COMPLAINT

82.    N.Y. Gen. Bus. Law § 350 further declares unlawful "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

83.    As described above, while engaging in consumer-oriented trade or commerce within the State of New York during the time period relevant hereto, Robinhood:

    a.    facilitated illegal sports wagering on an online sports gambling platform that has not obtained a license from the N.Y. Commission, rendering such operations unlawful;

    b.    falsely represented its unlawful online sports gambling platform as legal and in compliance with regulations; and

    c.    falsely represented its products as "investments" or "trading" when, in reality, they are unlawful gambling.

84.    The foregoing deceptive acts and practices were directed at consumers.

85.    As a result of Robinhood's false, misleading, and deceptive misrepresentations and omissions, Plaintiff Reyes and the members of the New York Subclass have suffered and continue to suffer economic injury.

86.    Plaintiff Reyes and members of the New York Subclass suffered an ascertainable loss caused by Robinhood's misrepresentations.

87.    On behalf of himself and other members of the New York Subclass, Plaintiff Reyes seeks to enjoin the unlawful facts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, three-times actual damages, and reasonable attorneys' fees.

## COUNT II

### Violations of New York's Statute of Anne, N.Y. Gen. Oblig. Law § 5-419

### On Behalf of Plaintiff Reyes and the New York Subclass

88.    Plaintiff Reyes re-alleges and incorporates all other factual allegations set forth herein.

89.    Robinhood operated a sports gambling platform in the State of New York without an applicable license from the NY Commission in violation of N.Y. PML § 1367-a(2)(a).

90.    Pursuant to New York's Statute of Anne, N.Y. Gen. Oblig. Law § 5-419, Plaintiff Reyes and the New York Subclass are entitled to recover losses resulting from trading event contracts on Robinhood's platform.

– 21 –

CLASS ACTION COMPLAINT

91.    N.Y. Gen. Oblig. Law § 5-419 provides:

Any person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not.

92.    Plaintiff Reyes and the New York Subclass wagered and lost money on Robinhood's platform, which was falsely represented as lawful and in compliance with regulations.  These trades were executed in New York.

93.    Accordingly, Plaintiff Reyes and the New York Subclass seek to recover damages, treble damages, equitable relief, and attorney's fees and costs to remedy Robinhood's wrongful conduct.

## COUNT III

### Violations of New York's Statute of Anne, N.Y. Gen. Oblig. Law § 5-421

### On Behalf of Plaintiff Reyes and the New York Subclass

94.    Plaintiff Reyes re-alleges and incorporates all other factual allegations set forth herein.

95.    Robinhood operated a sports gambling platform in the State of New York without an applicable license from the NY Gaming Commission in violation of NY PML § 1367-a(2)(a). Accordingly, the sports event contracts that Robinhood offered were nothing more than unlawful sports bets.

96.    Pursuant to New York's Statute of Anne, N.Y. Gen. Oblig. Law § 5-421, Plaintiff Reyes and the New York Subclass are entitled to recover losses resulting from trading sports event contracts on Robinhood's platform.

97.    N.Y. Gen. Oblig. Law § 5-421 provides:

Every person who shall, by playing at any game, or by betting on the sides of hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof.

– 22 –

98.    Plaintiff Reyes and the New York Subclass, relying on Robinhood's representations, wagered and lost money on Robinhood's platform, which was falsely represented as lawful and in compliance with existing New York law and regulations.

99.    These trades were executed in New York.

100.    Accordingly, Plaintiff Reyes and the New York Subclass seek to recover damages, treble damages, equitable relief, and attorneys' fees and costs to remedy Robinhood's wrongful conduct.

## <u>COUNT IV</u>

### Violations of Georgia's Statute of Anne, Ga. Code Ann. § 13-8-3

### On Behalf of Plaintiff Jordan and the Georgia Subclass

101.    Plaintiff Jordan re-alleges and incorporates all other factual allegations set forth herein.

102.    Georgia law contains a prohibition against operating a commercial gambling enterprise that states a person commits the offense of the law when he "operates or participates in earnings of a gambling place;" "receives, records, or forwards a bet or offer to bet;" "becomes a custodian of anything of value bet or offered to be bet;" or "sells chances upon the partial or final result of or upon the margin of victory in any game or contest or upon the performance of any participant in any game or contest[.]" Ga. Code Ann. § 16-12-22(a). Under Georgia law, a "bet" is defined "an agreement that, dependent upon chance even though accompanied by some skill, one stands to win or lose something of value." Ga. Code § 16-12-20. Robinhood has not obtained a license or other authorization to operate a commercial gambling enterprise in Georgia.

103.    Pursuant to Georgia's Statute of Anne, Ga. Code. Ann. § 13-8-3, Plaintiff Jordan and the Georgia Subclass are entitled to recover losses resulting from trading event contracts on Robinhood's platform.

104.    Georgia Code Ann. § 13-83(b) provides:

> Money paid or property delivered upon a gambling consideration may be recovered from the winner by the loser by institution of an action for the same within six months after the loss and, after the expiration of that time, by institution of an action by any person, at any time within four years, for the joint use of himself and the educational fund of the county.

105.   Plaintiff Jordan and the Georgia Subclass wagered and lost money on Robinhood's platform, which was falsely represented as lawful and in compliance with regulations.  These trades were executed in Georgia.

106.   Accordingly, Plaintiff Jordan and the Georgia Subclass seek to recover damages, treble damages, equitable relief, and attorney's fees and costs to remedy Robinhood's wrongful conduct.

## COUNT V

**Violations of the Georgia Fair Businesses Practices Act, Ga. Code Ann.**

**§ 10-1-390, et seq.**

**On Behalf of Plaintiff Jordan and the Georgia Subclass**

107.   Plaintiff Jordan re-alleges and incorporates all other factual allegations set forth herein.

108.   The Georgia Fair Business Practices Act ("Georgia FBPA") provides that "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful." Ga. Stat. Ann. § 10-1-393(a).

109.   Defendants are each a "person" as defined by the Georgia FBPA. Ga. Code. Ann. § 10-1-392(a)(24).

110.   Plaintiff Jordan and the members of the Georgia Subclass are "consumers" within the meaning of the Georgia FBPA. Ga. Code Ann. § 10-1-392(a)(6).

111.   The purchase and sale of sports event contracts on Defendants' Prediction Markets Hub constituted "consumer transactions" as defined by the Georgia FBPA. Ga. Code Ann. § 10-1-392(a)(10).

112.   As described above, while engaging in trade or commerce within the State of Georgia during the time period relevant hereto, Defendants:

   a.   facilitated illegal commercial gambling on an online sports gambling platform that has not obtained authorization to operate a gambling operation from the State of Georgia, rendering such operations unlawful; and

   b.   falsely represented its unlawful online sports gambling platform as legal and in compliance with regulations; and

– 24 –

CLASS ACTION COMPLAINT

c. falsely represented its products as "investments" or "trading" when, in reality, they are unlawful gambling.

113. The aforesaid methods, acts, and practices constitute unfair, unconscionable, or deceptive acts or practices in the conduct of any trade or commerce in violation of the Georgia FBPA, including, but not limited to, the following:

a. "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have." (Ga. Code Ann. § 10-1-393(b)(5));

b. "Representing that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another." (Ga. Code Ann. § 10-1-393(b)(7)); and

c. "Advertis[ed] goods or services with intent not to sell them as advertised." (Ga. Code Ann. § 10-1-393(b)(9)).

114. Defendants do not maintain a place of business or assets within the State of Georgia.

115. Plaintiff Jordan and the other members of the Georgia Subclass have been and continue to be injured as a direct and proximate result of Defendants' violations of the Georgia FBPA.

116. Defendants' conduct presents a continuing risk to Plaintiff Jordan, the members of the Georgia Subclass, and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

117. Plaintiff Jordan and the members of the Georgia Subclass are entitled to equitable relief.

118. Plaintiff Jordan, on behalf of himself and the Georgia Subclass, seeks actual damages, injunctive relief, other equitable relief, costs, and attorneys' fees as permitted by Ga. Code Ann. § 10-1-399.

– 25 –

**COUNT VI**

**Violations of the Florida Deceptive and Unfair Trade Practices Act,**

**Fla. Stat. Ann. § 501.201, et seq.**

**On Behalf of Plaintiff Collar and the Florida Subclass**

119.    Plaintiff Collar re-alleges and incorporates all other factual allegations set forth herein.

120.    The Florida Deceptive and Unfair Trade Practices Act ("FDUPTA") prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. §501.204(1).

121.    An unfair practice is "one that 'offends established public policy' and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *PNR, Inc. v. Beacon Property Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003).

122.    Defendants' sale of sports event contracts constitutes "trade or commerce" as defined in Fla. Stat. Ann. § 501.203(8).

123.    As described above, while engaging in trade or commerce within the State of Florida during the time period relevant hereto, Defendants:

    a.    facilitated illegal sports wagering on an online sports gambling platform that has not obtained a license from the Florida Commission, rendering such operations unlawful;

    b.    falsely represented its unlawful online sports gambling platform as legal and in compliance with regulations; and

    c.    falsely represented its products as "investments" or "trading" when, in reality, they are unlawful gambling.

124.    Plaintiff Collar and the members of the Florida Subclass have been and continue to be injured as a direct and proximate result of Defendants' violations of the FDUTPA.

125.    Plaintiff Collar and the other members of the Florida Subclass were misled by Robinwood into believing that Robinhood's Prediction Markets Hub is legal when, in fact, it is not, leading to Plaintiff Collar and members of the Florida Subclass to lose thousands of dollars on Robinhood's Prediction Markets Hub.

126.    Plaintiff Collar is entitled to pursue a claim on behalf of the Florida Subclass against Defendants pursuant to Fla. Stat. Ann. §§ 501.2105 and 501.211 for damages, equitable relief, and attorneys' fees and costs to remedy Defendants' violations of the FDUTPA.

## COUNT VII

### Unjust Enrichment

### On Behalf of each Class

127.    Plaintiffs re-allege and incorporate all other factual allegations set forth herein.

128.    Plaintiffs and the Class conferred a benefit on Robinhood by trading event contracts on Robinhood's platform and paying commission fees per contract. Robinhood knowingly offered illegal sports bets and unjustly profited on Plaintiffs and the Class.

129.    In the absence of a contract, Plaintiffs and the Class have no adequate remedy at law.

130.    Robinhood's unjust enrichment can be remedied by ordering Defendants to provide restitution, and to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and the Class, all proceeds received from Plaintiffs and the Class as a result of unlawful and/or inequitable conduct described herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court award the following relief:

131.    Certify this action as a class action, appoint Plaintiffs as the Class representatives, and designate the undersigned as Class counsel;

132.    Declare Robinhood's conduct unlawful;

133.    Enjoin Robinhood from the unlawful conduct alleged herein;

134.    Award Plaintiffs and the Class (and Subclasses) damages under common law and/or by statute, including treble and/or punitive damages;

135.    Award Plaintiffs and the Class (and Subclasses) restitution and/or disgorgement;

136.    Award Plaintiffs attorney's fees, costs, and pre-judgment and post-judgment interest; and

137.    Grant such other and further relief as the Court may deem just and proper.

CLASS ACTION COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class demand a trial by jury on all triable issues.

Dated: June 12, 2026

**WOLF POPPER LLP**

By:    */s/ Philip M. Black*
Philip M. Black (SBN 308619)
WOLF POPPER LLP
100 Pine St., Ste. 1250
San Francisco, CA 94111
Telephone: (415) 745-3232
Email: pblack@wolfpopper.com

Robert C. Finkel (*pro hac vice* application filed)
Timothy D. Brennan (*pro hac vice* application to be filed)
WOLF POPPER LLP
570 Lexington Ave.
New York, NY 10022
Telephone: (212) 759-4600
Email: rfinkel@wolfpopper.com
        tbrennan@wolfpopper.com

OF COUNSEL:

Fred T. Isquith
ISQUITH LAW LPPC
103 East 84th Street
New York, NY 10028
Telephone: (718) 775-6478
Email: isquithlaw@gmail.com

*Attorneys for Plaintiffs and the Proposed Class*

– 28 –

CLASS ACTION COMPLAINT